UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUSAN GLEASON, CANDI GABRIELSE,
Individually, and as representatives of a Class
of Participants and Beneficiaries
of the Bronson Healthcare Group, Inc.
403(b) Tax Sheltered Matching Plan,

        Plaintiffs,

        v.

BRONSON HEALTHCARE GROUP, INC.,

        and

BOARD OF DIRECTORS OF BRONSON
HEALTHCARE GROUP, INC.,

        and

JOHN DOES 1-30,

        Defendants.

Case No. 21-cv-

**CLASS ACTION
COMPLAINT
FOR CLAIMS UNDER
29 U.S.C. § 1132(a)(2)**

## COMPLAINT

COMES NOW Plaintiffs, Susan Gleason, and Candi Gabrielse, individually and as representatives of a Class of Participants and Beneficiaries on behalf of the Bronson Healthcare Group, Inc. 403(b) Tax Sheltered Matching Plan (the "Plan"), by their counsel, WALCHESKE & LUZI, LLC and HANEY LAW FIRM, P.C., as and for a claim against Defendants, alleges and asserts to the best of their knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1.     The essential remedial purpose of the Employee Retirement Income Security Act ("ERISA") is "to protect the beneficiaries of private pension plans." *Nachwalter v. Christie*, 805 F.2d 956, 962 (11th Cir. 1986).

2.     The law is settled that ERISA fiduciaries have a duty to evaluate fees and expenses when selecting retirement service providers and investments *as well as* a continuing duty to monitor fees and expenses of selected retirement service providers and investments and remove imprudent ones. *Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1828 (2015); 29 U.S.C. §1104(a)(1)(A) (fiduciary duty includes "defraying reasonable expenses of administering the Plan"); 29 C.F.R. §2250.404a-1(b)(i) (ERISA fiduciary must give "appropriate consideration to those facts and circumstances" that "are relevant to the particular investment."). It is for good reason that ERISA requires fiduciaries to be cost-conscious:

> Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution Plan," *Tibble,* 135 S. Ct. at 1826, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.

> *Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019).

3.     Defendants, Bronson Healthcare Group, Inc. ("Bronson"), the Board of Directors of Bronson Healthcare Group, Inc. ("Board Defendants"), and John Does 1-30 (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 403(b) defined contribution pension plan – known as the Bronson Healthcare Group, Inc. 403(b) Tax Sheltered Matching Plan (the "Plan") – that it sponsors and provides to its employees.

4.     Plaintiffs allege that during the putative Class Period (May 6, 2015 through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA, 29 U.S.C. §1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other Participants of the Plan by, among other things: (1) authorizing the Plan to pay unreasonably high fees for retirement plan services ("RPS"); and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and better performance.

5.     These objectively unreasonable RPS and investment management fees, cannot be justified. Defendants' failures breached the fiduciary duties they owed to Plaintiffs, Plan Participants, and beneficiaries. Prudent fiduciaries of 401(k) Plans continuously monitor fees against the market rates, applicable benchmarks, and peer groups to identify objectively unreasonable and unjustifiable fees. Defendants did not engage in a prudent decision-making process, as there is no other explanation for why the Plan paid these objectively unreasonable fees for RPS and investment management.

6.     To remedy, Plaintiffs bring this action on behalf of the Plan under 29 U.S.C. §1132(a)(2) to enforce Defendants' liability under 29 U.S.C. §1109(a) to make good to the Plan all losses resulting from their breaches of fiduciary duty.

## JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. §1331 and pursuant to 29 U.S.C. §1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. §1001 et seq.

8.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

9. Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within the District.

10. In conformity with 29 U.S.C. §1132(h), Plaintiffs served the Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

11. Plaintiff, Susan Gleason, is a resident of the State of Michigan and currently resides in Gobles, Michigan, and during the Class Period, was a participant in the Plan under 29 U.S.C. § 1002(7).

12. Plaintiff Gleason was employed by Bronson, or its predecessor, at Bronson LakeView Hospital from approximately October 23, 1995 until July 13, 2017, as a Registered Nurse, when she suffered an injury at work and was unable to work again.

13. Plaintiff, Candi Garbielse, is a resident of the State of Michigan and currently resides in Coloma, Michigan, and during the Class Period, was a participant in the Plan under 29 U.S.C. § 1002(7).

14. Plaintiff Garbielse was employed by Bronson, or its predecessor, at Bronson LakeView Hospital from approximately June 2005 until May 2019, as the Manager of Surgery.

15. Plaintiffs have Article III standing to bring this action on behalf of the Plan because they suffered actual injuries to their own Plan account in which they are still Participants, those injuries are fairly traceable to Defendants' unlawful conduct, and the harm is likely to be redressed by a favorable judgment.

16.     It is well settled, moreover, that recovery may be had for the Class Period before Plaintiffs personally suffered injury, as that turns on ERISA §502(a)(2) on which their claim rests. This claim is brought in a representative capacity on behalf of the Plan as a whole and remedies under ERISA §409 protect the entire Plan. Courts have recognized that a plaintiff with Article III standing, like Plaintiffs, may proceed under ERISA §502(a)(2) on behalf of the Plan and all participants in the Plan. Plaintiffs may seek relief under ERISA §502(a)(2) that sweeps beyond their own injury and beyond any given investment they have held as Participants in the Plan.

17.     The named Plaintiffs and all Participants in the Plan suffered ongoing financial harm because of Defendants continued imprudent and unreasonable investment and fee decisions made regarding the Plan.

18.     The named Plaintiffs and all Participants in the Plan did not have knowledge of all material facts (including, among other things, the RPS fees, investment alternatives that are comparable to the investments offered within the Plan, and total cost comparisons to similarly sized Plans) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

19.     The named Plaintiffs and all Participants in the Plan, having never managed a large 403(b) Plan such as the Plan, lacked actual knowledge of reasonable fee levels and prudent alternatives available to such Plans. Further, Plaintiffs did not have actual knowledge of the specifics of Defendants' decision-making processes with respect to the Plan (including Defendants' processes for selecting and monitoring the Plan's retirement plan service provider (RPSP)) because this information is solely within the possession of Defendants prior to discovery. For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon (among other things) the facts set forth below.

20.     Bronson Healthcare Group, Inc. ("Bronson") is a healthcare system that serves individuals in southwest Michigan and northern Indiana. With 8500 employees, it offers a full range of services from primary care to advanced critical care. Plaintiffs worked at Bronson LakeView Hospital, located at 408 Hazen St., Paw Paw, Michigan 49079. In this Complaint, "Bronson" refers to the named Defendant and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain.

21.     Bronson acted through its officers, including the Board Defendants, and their members (John Does 1-10), to perform Plan-related fiduciary functions in the course and scope of their business. Bronson appointed other Plan fiduciaries, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Bronson is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

22.     Bronson is also the Plan Administrator of the Bronson Healthcare Group, Inc. 403(b) Tax Sheltered Matching Plan, located at 601 John Street, Box G, Kalamazoo, MI 49007-5333. As the Plan Administrator, Bronson is also a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). It has authority and responsibility for the control, management, and administration of the Plan in accord with 29 U.S.C. § 1102(a). The Committee has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities. Bronson in its Plan Administrator capacity, as well as individuals who carried out Plan functions (John Does 11-20), are collectively referred to herein as the "Plan Administrator Defendants."

23.     To the extent that there are additional officers and employees of Bronson who are/were fiduciaries of the Plan during the Class Period, or other individuals who were hired as

investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Bronson officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

24.     The Plan is a Section 403(b) "defined contribution" pension Plan under 29 U.S.C. §1102(2)(A) and 1002(34), meaning that Bronson' contribution to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution Plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct.at 1826. Thus, the employer has no incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly performing investments are borne by the participants.

25.     The Plan currently has about $737,500,000 in assets entrusted to the care of the Plan's fiduciaries. The Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not sufficiently attempt to reduce the Plan's expenses or exercise appropriate judgment to monitor its RPSP and each investment option to ensure they were a prudent choice.

26.     With 11,133 participants in the year 2019, the Plan had more participants than 99.84% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year. Similarly, with $737,501,972 in assets in the year 2019, the Plan had more assets than 99.78% of the defined contribution Plans in the United States that filed 5500 forms for the 2019 Plan year.

## ERISA'S FIDUCIARY STANDARDS

27.    ERISA imposes strict fiduciary standards of loyalty and prudence on Defendants

as a Plan fiduciaries. 29 U.S.C. §1104(a)(1) provides in relevant part:

[A] fiduciary shall discharge his duties with respect to a Plan solely in the interest of the participants and beneficiaries and –

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; and
(ii) defraying reasonable expenses of administering the Plan; [and]

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

28.    With certain exceptions, 29 U.S.C. §1103(c)(1) provides in relevant part:

[T]he assets of a Plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the Plan and their beneficiaries and defraying reasonable expenses of administering the Plan.

29.    29 U.S.C. §1109 provides in relevant part:

Any person who is a fiduciary with respect to a Plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such Plan any losses to the Plan resulting from each such breach, and to restore to such Plan any profits of such fiduciary which have been made through use of assets of the Plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

30.    Under ERISA, fiduciaries that exercise any authority or control over Plan assets,

including the selection of Plan investments and service providers, must act prudently and for the

exclusive benefit of participants in the Plan, and not for the benefit of third parties including service

providers to the Plan such as RPSP and those who provide investment products. Fiduciaries must

ensure that the amount of fees paid to those service providers is no more than reasonable. *See* DOL

Adv. Op. 97-15A; DOL Adv. Op. 97-16A.

31.     "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.,* 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros v. Cody*, 744 F.2d 270, 279 (2nd Cir. 1984) (fiduciaries must use "the appropriate methods to investigate the merits" of Plan investments). Fiduciaries must "initially determine, and continue to monitor, the prudence of each investment option available to Plan Participants." *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 423 (4th Cir. 2007) (emphasis original); 29 C.F.R. §2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv. Opinion 88-16A. Thus, a defined contribution Plan fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1828-29.

32.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act §7.

33.     29 U.S.C. §1132(a)(2) authorizes Plan Participants to bring a civil action for appropriate relief under 29 U.S.C. §1109.

## DEFINED CONTRIBUTION INDUSTRY

34.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under a plan. Among many options, employers may make contributions on behalf of all employees and/or make matching contributions based on the employees' elective deferrals.  Employees with money in a

plan are referred to as "Participants."

35.     As of September 2020, Americans had approximately $9.3 trillion in assets invested in defined contribution plans, such as 401(k) and 403(b) plans. See INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total $33.1 Trillion in Third Quarter 2020* (Dec. 16, 2020), available at https://www.ici.org/research/stats/retirement/ret_20_q3. Defined contribution plans have largely replaced defined benefit plans—or pension plans—that were predominant in previous generations. See BANKRATE, *Pensions Decline as 401(k) Plan Multiply* (July 24, 2014), available at http://www.bankrate.com/finance/retirement/pensions-decline-as-401-k-Plan-multiply-1.aspx. By 2012, approximately 98% of employers who offered a retirement plan, offered defined contribution plans to their current employees, whereas only 3% offered pension plans. *Id.*

36.     Failures by ERISA fiduciaries to monitor fees and costs for reasonableness have stark financial consequences for retirees. Every extra level of expenses imposed upon plan participants compounds over time and reduces the value of participants' investments available upon retirement.

37.     The potential for disloyalty and imprudence is much greater in defined contribution plans than in defined benefit plans. In a defined benefit plan, the participant is entitled to a fixed monthly pension payment, while the employer is responsible for making sure the plan is sufficiently capitalized, and thus the employer bears all risks related to excessive fees and investment underperformance. *See Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 439 (1999). Therefore, in a defined benefit plan, the employer and the plan's fiduciaries have every incentive to keep costs low and to remove imprudent investments. But in a defined contribution plan, participants' benefits "are limited to the value of their own investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct. at 1826.

Thus, the employer has no incentive to keep costs low or to closely monitor the plan to ensure every investment remains prudent, because all risks related to high fees and poorly performing investments are borne by the employee.

**Retirement Plan Services**

38.     Defined Contribution plan fiduciaries virtually always hire service providers to deliver a retirement plan benefit to their employees. There is a large group of national retirement plan services providers ("RPSP"), commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of virtually all retirement plans. In some cases, these RPSP have developed all the capabilities "in-house," while in other cases, the RPSP outsource some of the required services to other service providers.

39.     These RPSP deliver all the essential recordkeeping and related administrative ("RK&A") services through standard bundled offerings.

40.     There is no material difference between services needed or required by 403(b) plans and 401(k) plans.  Virtually all RPSP provide services to both 401(k) plans and 403(b) plans.  The service offerings for these two different defined contribution plan types do not differ in any material way.  Prudent fiduciaries of 403(b) plans can achieve the same reasonable prices for RPS from RPSP as prudent fiduciaries of 401(k) plans.

41.     There are two types of essential RK&A services provided by all RPSP.  For large plans with substantial bargaining power (like the Plan here), the first type, "Bundled RK&A," is provided as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided in retirement industry parlance on an "all-you-can-eat" basis). The Bundled RK&A services include, but are not limited to, the following standard services:

   a.   Recordkeeping;

b.  Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c.  Administrative Services related to converting a plan from one RPSP to another RPSP;

d.  Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.  Maintenance of an employer stock fund (if needed);

f.  Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.  Plan consulting services including assistance in selecting the investments offered to participants;

h.  Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

i.  Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan is in compliance with legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

j.  Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

42.    The second type of essential RK&A services, hereafter referred to as "Ad Hoc RK&A" services, provided by all RPSP, often have separate, additional fees based on the conduct of individual participants and the usage of the service by individual participants (usage fees).  These fees are paid only by the participants who choose or need these services.  These "Ad Hoc RK&A" services typically include, but are not limited to, the following:

a.  Loan Processing;

b.  Brokerage services/account maintenance (if offered by the plan);

c.  Distribution services; and

d.  Processing of Qualified Domestic Relations Orders.

43.    For large plans with more than 10,000 participants, like the Plan here, any minor variations in the way that these two types of essential RK&A services, as well as any other RK&A

services included in the bundled offering of RK&A services, are delivered has no material impact on the fees charged by RPSP.  That fact is confirmed by the practice of all RPSP quoting fees for the Bundled RK&A services on a per participant basis without regard for any individual differences in services requested -- which are treated by the RPSP as immaterial because they are, in fact, inconsequential from a cost perspective to the delivery of the Bundled RK&A services.

44.     The combination of Bundled RK&A Services and Ad Hoc RK&A services can be referred to as retirement plan services ("RPS").  Most fees earned by RPSP through providing RPS typically come from the bundled fee for providing the Bundled RK&A services as opposed to the Ad Hoc RK&A services.

45.     The Plan had a standard package of RPS, i.e., Bundled RK&A Services and Ad Hoc RK&A services as described above, and like almost all comparable plans with similar numbers of participants and/or assets under management.

46.     Because RPSP offer the same bundles and combinations of services as their competitors, the market for defined contribution RPS has become increasingly price competitive, particularly for large plans that, like the Plan here, have a sizable number of participants and a large amount of assets.

47.     Over the past twenty years, the fees that RPSP have been willing to accept for providing RPS has significantly decreased.  RPSP are willing (or competitively required) to accept a lower and more competitive fee because of, among other things, the competitive pressures created by greater information becoming available to plan fiduciaries and the reduction in opaque fee structures.

48.     By the start of and during the entire Class Period, the level of fees that RPSP have been willing to accept for providing RPS has stabilized, and has not materially changed for large

plans, including the Plan here. In other words, reasonable RPS fees paid in 2018 or 2019 are representative of the reasonable fees for RPS during the entire Class Period.

49.     The underlying cost to a RPSP of providing the RPS to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan.

50.     The incremental cost for a RPSP to provide RPS for a participant's account does not materially differ from one participant to another and is not dependent on the balance of the participant's account.

51.     RSPS for relatively larger defined contribution plans, like the Plan here, experience certain efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants increase because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low.

52.     Therefore, while the total cost to an RPSP to deliver RPS increases as more participants join the Plan, the cost per participant to deliver the RPS decreases.

53.     Since at least the early 2000s, plan fiduciaries and their consultants and advisors have been aware of this cost structure dynamic for RPSP.

54.     Since at least the early 2000s, Defendants should have been aware of this cost structure dynamic for RPSP.

55.     Sponsors of defined contribution plans contract for RPS separately from any contracts related to the provision of investment management services to plan participants.

56.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of RPS performed by the RPSP on behalf of the investment manager.

57.     As a result, RPSP often make separate contractual arrangements with mutual fund providers. For example, RPSP often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing."

58.     For example, if a mutual fund has a total expense ratio fee of 0.75%, the mutual fund provider may agree to pay the RPSP 0.25% of the 0.75% total expense ratio fee that is paid by the investor in that mutual fund (in this context the Plan Participant). That 0.25% portion of the 0.75% total expense ratio fee is known as the "revenue sharing."

59.     In the context of defined contribution plans, the amount of revenue sharing is deemed to be the amount of revenue paid by participants that is allocable to RPS. The difference between the total expense ratio and the revenue sharing is known as the "Net Investment Expense to Retirement Plans."

60.     In the context of defined contribution plans, when a Plan adopts prudent and best practices, the Net Investment Expense to Retirement Plans is the actual amount a Plan Participant pays for the investment management services provided by a portfolio manager.

61.     RPSP typically collect their fees through direct payments from the Plan or through indirect compensation such as revenue sharing, or some combination of both.

62.     Regardless of the pricing structure that the plan fiduciary negotiates with any service provider, the amount of compensation paid to service providers, including the RPSP, must be reasonable.

63.     As a result, plan fiduciaries must understand the total dollar amounts paid to their service providers, including the RPSP, and be able to determine whether the compensation is reasonable by understanding what the market is for the RPS received by the Plan.

64.     During the Class Period, Defendants knew and/or were aware that a Plan with more participants can and will receive a lower effective per participant RPS fee when evaluated on a per participant basis.

65.     During the Class Period, Defendants knew and/or were aware that the Plan should have received a lower effective per participant RPS fee when evaluated on a per participant basis.

**Investments**

66.     Plan fiduciaries of a defined contribution Plan have a continuing and regular responsibility to select and monitor all investment options they make available to Plan Participants.

67.     The primary purpose in selecting Plan investments is to give all participants the opportunity to create an appropriate asset allocation under modern portfolio theory by providing diversified investment alternatives.

**THE PLAN**

68.     During the entire Class Period, the Plan received RPS from Fidelity Investments Institutional ("Fidelity"), a well-known and large RPSP.

69.     At all relevant times, the Plan's fees were excessive when compared with other comparable 403(b) and 401(k) plans offered by other sponsors that had similar numbers of plan participants, and similar amounts of money under management. The fees were also excessive relative to the RPS services received, since such services were largely identical. These excessive fees led to lower net returns than participants in comparable 403(b) and 401(k) plans enjoyed.

70.     During the Class Period, Defendants breached their duties owed to the Plan, to Plaintiffs and to all other Plan Participants, by: (1) failing to monitor the RPS fees paid by the plan to ensure that they were reasonable and, as a result, authorizing the Plan to pay objectively unreasonable and excessive RPS fees, relative to the RPS received; and (2) maintaining certain

funds in the Plan despite the availability of identical or similar investment options with lower costs and better performance.

71.     Defendants' mismanagement of the Plan, to the detriment of Plan Participants and beneficiaries, breached the fiduciary duties of prudence and loyalty in violation of 29 U.S.C. §1104.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING RPSP

72.     A plan fiduciary is required to fully understand all sources of revenue received by all service providers, including its RPSP. It must regularly monitor that revenue to ensure that the compensation received is, and remains, reasonable for the services provided.

73.     Prudent plan fiduciaries ensure they are paying only reasonable fees for RPS by soliciting competitive bids from other service providers to perform the same services currently being provided to the plan. This is not a difficult or complex process and is performed regularly by prudent plan fiduciaries.

74.     For Plans with as many participants as Defendants' Plan, some RPSP would require only the number of participants while others might require only the number of participants and the amount of the assets to provide a quote.  Prudent plan fiduciaries have all this information readily available and can easily receive a quote from other RPSP to determine if the current level of RPS fees is reasonable.

75.     Having received bids, the prudent plan fiduciary can negotiate with its current provider for a lower fee and/or move to a new provider to provide the same (or better) services for a competitive reasonable fee if necessary.

76.     Prudent plan fiduciaries follow this same process to monitor the fees of retirement plan advisors and/or consultants as well as any other covered service providers.

77.     After the revenue requirement is negotiated, the plan fiduciary determines how to pay the negotiated RPS fee. The employer/plan sponsor can pay the RPS fee on behalf of participants, which is the most beneficial to plan participants. If the employer were paying the fee, the employer would have an interest in negotiating the lowest fee a suitable RPSP would accept. Usually, however, the employer decides to have the plan (plan participants) pay the RPS fee instead. If the RPS fee is paid by plan participants, the plan fiduciary can allocate the negotiated fee among participant accounts on a per capita or pro-rata basis.

78.     If the plan negotiates a per participant revenue threshold of $30.00 for the Bundled RK&A, the plan does not need to require that each participant pay $30.00. Rather, the plan fiduciary could determine that an asset-based fee is more appropriate for plan participants and allocate the Bundled RK&A fee pro rata to participants. For example, a 15,000 participant-plan with a $30.00 revenue threshold would pay $450,000 for RPS. If the plan had $3,000,000,000 in assets, then the $450,000 would work out to 1.5 basis points. Accordingly, the plan fiduciary could allocate the $450,000 to plan participants by requiring that each participant pay 1.5 basis points.

79.     In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the plan. This structure creates situations in which the RPS do not change but, because of market appreciation and contributions to the plan, the revenue received by the RPSP increases. This structure was historically preferred by RPSP because it allowed them to obtain an increase in revenue without having to ask the client to pay a higher fee.

80.     Regardless of the pricing structure, and Plaintiffs state no preference, the plan fiduciary must ensure that the fees paid to service providers for RPS are reasonable.

81.     All these standards were accepted and understood by prudent plan fiduciaries,

including Defendants, always during the Class Period.

82.     For example, fiduciary best practices based on DOL guidelines, case law, and marketplace experience are as follows:

1. Price administrative fees on a per-participant basis.

2. Benchmark and negotiate recordkeeping and investment fees separately.

3. Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size.

4. Benchmark and negotiate recordkeeping and trustee fees at least every other year.

. . . .

7. Review services annually to identify opportunities to reduce administrative costs.[1]

83.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's RPS costs. *Tussey v. ABB, Inc.,* 746 F.3d 327, 336 (8th Cir. 2014) (holding that fiduciaries of a 401(k) Plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the Plan); *George v. Kraft Foods Glob.*, Inc., 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution plan fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

84.     First, a plan fiduciary must pay close attention to the RPS fees being paid by the Plan. A hypothetical prudent fiduciary tracks the RPSP's expenses by demanding documents that summarize and contextualize the RPSP's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

---

[1] "Fiduciary Best Practices," *DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer LLC (2013).

85.     Second, to make an informed evaluation as to whether a RPSP or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent hypothetical fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's RPSP. To the extent that a plan's investments pay asset-based revenue sharing to the RPSP, prudent fiduciaries monitor the amount of the payments to ensure that the RPSP's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

86.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the RPS rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's RPS expenses have grown significantly or appear high in relation to the general marketplace.

87.     That said, even without a RFP, by merely soliciting bids from other RPSP, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for similar RPS services and have an idea of a starting point for negotiation.  Accordingly, the only way to determine the true market price at a given time is to obtain competitive bids through some process. *See George*, 641 F.3d at 800 (failure to solicit bids, and higher-than-market recordkeeping fees, supported triable fiduciary breach claim).

## THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR RPS FEES AND, AS A RESULT, THE PLAN PAID UNREASONABLE RPS FEES

88.     A plan fiduciary must continuously monitor its RPS fees by regularly soliciting competitive bids to ensure fees paid to covered service providers (such as RPSP) are reasonable.

89.     During the Class Period, Defendants knew or should have known that they must regularly monitor the Plan's RPS fees paid to covered service providers, including but not limited

to Fidelity.

90.     During the Class Period, Defendants failed to regularly monitor the Plan's RPS fees paid to covered service providers, including but not limited to Fidelity.

91.     During the Class Period, Defendants knew or should have known that they must regularly solicit quotes and/or competitive bids from covered service providers, including but not limited to Fidelity, to avoid paying objectively unreasonable fees for RPS.

92.     During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from covered service providers, including but not limited to Fidelity, to avoid paying unreasonable fees for RPS.

93.     During the Class Period, Defendants knew or should have known that it was in the best interests of the Plan's Participants to ensure that the Plan paid no more than a competitive reasonable fee for RPS.

94.     During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants failed to ensure that the Plan paid no more than a competitive reasonable fee for RPS.

95.     During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was done ineffectively given the objectively unreasonable fees paid for RPS.

96.     During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in objectively reasonable and/or prudent efforts to ensure that the Plan paid no more than a competitive reasonable fee for RPS.

97.     During the Class Period and because Defendants failed to regularly monitor the Plan's RPS fees paid to covered service providers, including but not limited to Fidelity, the Plan's RPS fees were significantly higher than they would have been had Defendants engaged in this

process.

98.     During the Class Period, given the Plan's objectively unreasonable RPS fees, Defendants engaged in an ineffective fiduciary process in soliciting competitive bids for these services.

99.     During the Class Period and because Defendants did not engage in objectively reasonable and/or prudent efforts when paying fees for RPS to covered service providers, including but not limited to Fidelity, the RPS fees were significantly higher than they would have been had Defendants engaged in these efforts.

100.    From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below shows the actual year-end participants and annual RPS fees illustrating that the Plan had on average 9,915 participants with account balances and paid an average effective annual RPS fee of at least approximately $801,385, which equates to an average of at least approximately $81 per participant. These are the minimum amounts that could have been paid.

### Retirement Plan Services (RPS) Fees

|  | 2015 | 2016 | 2017 | 2018 | 2019 | *Average* |
|---|---|---|---|---|---|---|
| **Participants** | 8,267 | 9,158 | 10,224 | 10,792 | 11,133 | *9,915* |
| **Est. RPS Fees** | $563,863 | $673,147 | $845,831 | $825,623 | $1,098,460 | *$801,385* |
| **Est. RPS Per Participant** | $68 | $74 | $83 | $77 | $99 | *$81* |

101.    From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table below illustrates the annual RPS fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of

services, compared to the average annual RPS fees paid by the Plan (as identified in the table above).

**Comparable Plans' RPS Fees Based on Publicly Available Information from Form 5500[1]**

| Plan | Participants | Assets | RPS Fee | RPS Fee /pp | Recordkeeper | Graph Color |
|------|------|------|------|------|------|------|
| Smithfield Foods, Inc. Salaried 401(K) Plan | 6,149 | $500,178,777 | $278,907 | $45 | Great-West | White |
| Genesis Health System Retirement Savings Plan | 6,260 | $231,793,794 | $325,894 | $52 | Transamerica | White |
| Flowserve Corporation Retirement Savings Plan | 6,395 | $892,435,613 | $263,380 | $41 | T. Rowe Price | White |
| St. Luke's Health Network 403(B) Plan | 7,142 | $241,600,647 | $333,578 | $47 | Transamerica | White |
| Memorial Health System Defined Contribution Retirement Savings Plan | 7,318 | $221,242,194 | $385,754 | $53 | Transamerica | White |
| The Boston Consulting Group, Inc. Employees' Savings Plan and Profit-Sharing Retirement Fund | 8,067 | $894,454,060 | $336,660 | $42 | Vanguard | White |
| Bausch Health Companies Inc. Retirement Savings Plan | 8,902 | $904,717,349 | $322,496 | $36 | Fidelity | White |
| Children's Medical Center of Dallas Employee Savings Plan 403(B) | 9,356 | $349,335,673 | $337,416 | $36 | Fidelity | White |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $552,586,935 | $290,066 | $31 | T. Rowe Price | White |
| Vibra Healthcare Retirement Plan | 9,750 | $107,652,510 | $277,532 | $28 | Great-West | White |
| Centerpoint Energy Savings Plan | 9,802 | $2,108,802,293 | $442,946 | $45 | Voya | White |
| **Bronson Plan Average Fee** | **9,915** | **$528,693,454** | **$801,385** | **$81** | **Fidelity** | **Red** |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $324,171 | $33 | Great-West | White |
| Edward- Elmhurst Healthcare Retirement Savings Plan | 10,263 | $618,238,970 | $446,836 | $44 | Fidelity | White |

| | | | | | |
|---|---|---|---|---|---|
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard | White |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity | White |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity | White |
| DHL Retirement Savings Plan | 14,472 | $806,883,596 | $483,191 | $33 | Fidelity | White |

[1]Price calculations are based on 2018 Form 5500 information.

102.    From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the graph below illustrates the annual RPS fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual RPS fees paid by the Plan (as identified in the table above), with the white data points representing RPS fees that RPS providers offered to (and were accepted by) comparable Plans.



103.    From the years 2015 to 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrates that the Plan paid an effective average annual RPS fee of at least $81 per participant for RPS.

104.    From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual RPS fee of around $38 per participant, if not lower.

105.    From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with similar amounts of money under

management, had Defendants been acting in the exclusive best interest of the Plan's Participants the Plan actually would have paid significantly less than an average of approximately $801,385 per year in RPS fees, which equated to an effective average of approximately $81 per participant per year.

106.    From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, and as also compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, had Defendants been acting in the best interests of the Plan's Participants, the Plan actually would have paid on average a reasonable effective annual market rate for RPS of approximately $376,762 per year in RPS fees, which equates to approximately $38 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay more than double what they could otherwise pay for RPS.

107.    From the years 2015 through 2019 and based upon the best publicly available information, which was equally or even more easily available to Defendants during the Class Period, the Plan additionally cost its Participants on average approximately $424,622 per year in RPS fees, which equates to on average approximately $43 per participant per year.

108.    From the years 2015 to 2019, and because Defendants did not act in the best interests of the Plan's Participants, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan cost its Participants a total minimum amount of approximately $2,123,111 in unreasonable and excessive RPS fees.

109.    From the years 2015 to 2019 based upon the best publicly available information,

which was equally or even more easily available to Defendants during the Class Period, because Defendants did not act in the best interests of the Plan's Participants, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan cost its Participants (when accounting for compounding percentages) a total, cumulative amount in excess of $2,722,337 in RPS fees

110.     During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not regularly and/or reasonably assess the Plan's RPS fees it paid to Fidelity.

111.     During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the RPS fees it paid to Fidelity vis-à-vis the fees that other RPS providers would charge, and would have accepted, for the same services.

112.     During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's RPS fees it paid to Fidelity, but Defendants either simply failed to do so, or did so ineffectively given that it paid more than 100% higher for RPS fees than it should have.

113.     During the entirety of the Class Period and had Defendants engaged in regular and/or reasonable examination and competitive comparison of the RPS fees it paid to Fidelity, it would have realized and understood that the Plan was compensating Fidelity unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiffs and Plan Participants.

114.     The fees were also excessive relative to the RPS services received, since such services are standard for large 410(k) plans like the Plan here.

115.     During the entirety of the Class Period and by failing to recognize that the Plan and

its participants were being charged much higher RPS fees than they should have been and/or by failing to take effective remedial actions as described herein, Defendants breached their fiduciary duties of loyalty and prudence to Plaintiff and Plan Participants.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING INVESTMENT OPTIONS

116. For all practical purposes, there is a commonly accepted process to select and monitor investment options which is based on modern portfolio theory and the prudent investor standard. Under ERISA, plan fiduciaries are required to engage investment consultants or advisors to the extent that the plan fiduciaries do not have the investment expertise necessary to select and monitor investments.

117. That accepted process involves, among other things, evaluating the performance history, tenure, and stability of the current portfolio manager; the risk adjusted returns; and the fees.

118. When an active investment option is chosen, one of the most critical aspects of the analysis is to choose a portfolio manager because it is the skill of the portfolio manager that differentially impacts the performance of the investment.

119. From the perspective of a plan participant, the other critical component of the analysis is the fees.  However, the total expense ratio of an investment option is often comprised of multiple different types of fees, only one of which is specifically associated with the fee of the actual portfolio manager.

120. As a result, a plan fiduciary is required to understand the interrelationship between the pricing structure it has negotiated with the RPSP for RPS services as well as the different fee components of the investment options selected to be made available to plan participants.

121. If a Plan Fiduciary chooses an active investment option when other active options or an alternative index option are available, the Plan Fiduciary must make a specific and informed

finding that the probability that the selected active portfolio manager will outperform the other active options and the index warrants the higher fees paid to the active portfolio manager and the risk/reward tradeoffs show that the potential of outperformance is in the best interest of Plan Participants.

122.    If a Plan Fiduciary chooses an active investment option when other active options or an alternative index option is available, but the Plan Fiduciary does not make a specific and informed finding that the probability that the active portfolio manager will outperform the other active options and the index (and as such, warranting the higher fees paid charged by the active portfolio manager) and the risk/reward tradeoffs show that the potential of outperformance is in the best interest of Plan Participants, the Plan Fiduciary has acted unreasonably and/or imprudently.

123.    In February 2013, the Department of Labor issued guidance for the selection of target date funds in a publication titled, "Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries." Fiduciaries were given specific guidance to: (i) establish a process for comparing and selecting TDFs; (ii) establish a process for the periodic review of TDFs; (iii) understand the fund's investments – the allocation in different asset classes (stocks, bonds, cash), individual investments, and how these will change over time; (iv) inquire about whether a custom or non- proprietary target date fund would be a better fit for a plan; and (v) develop effective employee communications.

124.    The Department of Labor gave a very specific warning about the importance of keeping costs under control: "A difference of just one percentage point in fees (1.5% as compared with 0.5%) over 35 years dramatically affects overall returns. If a worker with a 401(k)-account balance of $25,000 averages a seven percent return, the worker will have $227,000 at retirement with the lower fee and $163,000 with the higher fee, assuming no further contributions."[4]

125.    Plan fiduciaries of plans as large as the Defendants' Plan are deemed to be

"Institutional Investors" and are deemed to have a higher level of knowledge and understanding of the different components of fees within the total expense ratio of an investment option.

126.    In fact, as "Institutional Investors," retirement plans often have the ability to access investment options and service structures that are not available or understood by retail investors such as individual plan participants like Plaintiff.

127.    For example, minimum investment requirements and other fees or restrictions are routinely waived for large retirement plans and were waived for the Plan's investments.

128.    As a result, when a plan fiduciary can choose among different types of investment options, e.g., collective trusts, to receive the services of a specific portfolio manager, the plan fiduciary is required to understand all the fees related to the different collective trusts and choose the collective trust that is in the best interest of the plan participants. This is especially critical when the pricing structure provides compensation to the RPSP from revenue sharing paid by plan participants as part of the total expense ratio of the investment options selected by the plan fiduciaries.

## DEFENDANTS' INVESTMENTS IN THE PLAN

129.    A prudent fiduciary will consider all plan investments, including "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." Restatement (Third) of Trusts § 100 cmt. b(1).

130.    While higher-cost mutual funds may outperform a less-expensive option over the short term, they rarely do so over a longer term. See Jonnelle Marte, Do Any Mutual Funds Ever Beat the Market? Hardly, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutualfunds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices that looked at 2,862 actively

managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); *see also* Index funds trounce actively managed funds: Study, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-activelymanaged-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

131.    Funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds, 67 J. Econ. Behav. & Org. 871, 873 (2009); *see also* Jill E. Fisch, Rethinking the Regulation of Securities Intermediaries, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

## **THE PLAN'S INVESTMENT IN THE FIDELITY FREEDOM FUNDS**

132.    The Plan offers a suite of 14 target date funds. A target date fund is an investment vehicle that offers an all-in-one retirement solution through a portfolio of underlying funds that gradually shifts to become more conservative as the assumed target retirement year approaches. All target date funds are inherently actively managed because managers make changes to the allocations to stocks, bonds, and cash over time. These allocation shifts are referred to as a fund's glide path. The underlying mutual funds that target date fund managers choose to represent each asset class can be actively or passively managed.

133.    According to the Plan's Form 5500s, from at least December 31, 2009 through at least December 31, 2019, the Plan offered Fidelity Freedom target date funds. Fidelity Management & Research Company ("FMRC") is the second largest target date fund provider by total assets. Among its several target date offerings, two of Fidelity's target date offerings are the

risky Freedom funds (the "Active suite") and the substantially less costly and less risky Freedom Index funds (the "Index suite").

134.    Defendants were responsible for crafting the Plan lineup and could have chosen any of the target date families offered by Fidelity, or those of any other target date provider. Defendants failed to compare the Active and Index suites and consider their respective merits and features. A simple weighing of the benefits of the two suites indicates that the Index suite is and has been a far superior option, and consequently the more appropriate choice for the Plan.

135.    Had Defendants carried out their responsibilities in a single-minded manner with an eye focused solely on the interests of the participants, they would have come to this conclusion and acted upon it. Instead, Defendants failed to act in the sole interest of Plan Participants and breached their fiduciary duty by imprudently selecting and retaining the Active suite for the Class Period.

136.    The two fund families have nearly identical names and share a management team. But while the Active suite invests predominantly in actively managed Fidelity mutual funds, the Index suite places no assets under active management, electing instead to invest in Fidelity funds that simply track market indices.

137.    The Active suite is dramatically more expensive than the Index suite, and riskier in both its underlying holdings and its asset allocation strategy. Defendants' decision to add the Active suite over the Index suite, and their failure to replace the Active suite with the Index suite at any point during the Class Period, constitutes a glaring breach of their fiduciary duties.

138.    Exacerbating Defendants' imprudent choice to add and retain the Active suite is its role as the Plan's Qualified Default Investment Alternative ("QDIA") during the Class Period. A retirement plan can designate one of the investment offerings from its lineup as a QDIA to aid

participants who lack the knowledge or confidence to make investment elections for their retirement assets; if participants do not direct where their assets should be invested, all contributions are automatically invested in the QDIA. Plan fiduciaries are responsible for the prudent selection and monitoring of an appropriate QDIA.

139. The Fidelity Freedom fund with the target year that is closest to a participant's assumed retirement age (age 65) serves as the QDIA in the Plan.

140. Given that most plan participants are not sophisticated investors, many of the Plan Participants, by default, concentrate their retirement assets in target date funds. As such, the impact of Defendants' imprudent selection of target date funds is magnified. Indeed, by December 31, 2019, approximately 62% of the Plan's assets were invested in the Active suite.

## THE ACTIVE SUITE IS HIGH-RISK AND UNSUITABLE FOR PLAN PARTICIPANTS

141. The Active suite chases returns by taking levels of risk that render it unsuitable for the average retirement investor, including participants in the Plan, and particularly those whose savings were automatically invested through the QDIA.

142. Although the equity glide paths of the two fund families (meaning the Active suite and Index suite) appear nearly identical, the Active suite subjects its assets to significantly more risk than the Index suite. At the underlying fund level, where the Index suite invests only in index funds that track segments of the market, the Active suite primarily features funds with a manager deciding which securities to buy and sell, and in what quantities.

143. The goal of an active manager is to beat a benchmark—usually a market index or combination of indices – by taking on additional risk. Market research has indicated that investors should be very skeptical of an actively managed fund's ability to consistently outperform its index, which is a significant concern for long-term investors saving for retirement, like the Plan

Participants in this action. Additionally, actively managed funds charge higher fees than index funds (which are passed on to the target date fund investor through higher expense ratios).

144.    These extra costs present an additional hurdle for active managers to clear to provide value and compensate investors for the added risk resulting from their decision-making. Indeed, Morningstar has repeatedly concluded that "in general, actively managed funds have failed to survive and beat their benchmarks, especially over longer time horizons."

145.    Although they may experience success over shorter periods, active fund managers are rarely able to time the market efficiently and frequently enough to outperform the market. The Active suite's allocation to primarily actively managed funds subjects investors to the decision-making skill and success, or lack thereof, of the underlying managers and the concomitant risk associated with these investments.

146.    The Active and Index suites appear to follow essentially the same strategy. The chart below shows the percentage of assets devoted to equities in each vintage.

| Equity Glide Path | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Years to Target Retirement Year | | | | | | | | | | | | |
| Series | 40 | 35 | 30 | 25 | 20 | 15 | 10 | 5 | 0 | -5 | -10 | -15 | -20 |
| Fidelity Freedom | 90 | 90 | 90 | 90 | 89 | 78 | 65 | 58 | 53 | 43 | 35 | 24 | 24 |
| Fidelity Freedom Index | 90 | 90 | 90 | 90 | 90 | 80 | 65 | 59 | 52 | 43 | 34 | 24 | 24 |

147.    This chart only considers the mix of the portfolio at the level of stocks, bonds, and cash. Across the glide path, the Active suite allocates approximately 1.5% more of its assets to riskier international equities than the Index suite. The Active suite also has higher exposure to classes like emerging markets and high yield bonds.

148.    Since the Active suite series underwent a strategy overhaul in 2013 and 2014, its managers have had the discretion to deviate from the glide path allocations by 10 percentage points

in either direction. In a departure from the accepted wisdom that target date funds should maintain pre-set allocations, Fidelity encouraged its portfolio managers to attempt to time market shifts to locate underpriced securities.

149.    This strategy heaps further unnecessary risk on investors, such as Plan Participants, in the Active suite. A March 2018 Reuters special report on the Fidelity Freedom funds details how many investors lost confidence in the Active suite "because of their history of underperformance, frequent strategy changes and rising risk." The report quotes a member of Longfellow Advisors, who told Reuters that, after the 2014 changes, "it was not clear to us that [the managers of the Active suite] knew what they were doing."

150.    During the Class Period, the chart below identifies several investment options that Defendants selected, including the Fidelity Freedom Active suite, and/or made available to Plan Participants as compared to prudent alternative and less expensive options (both active and passive).

| Defendants' Investments | | | | | Prudent Alternative Investments | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) |
| FNSHX | Fidelity Freedom® Income K | 0.42% | 0.20% | 0.22% | FFGZX | Fidelity Freedom® Index Inc Instl Prem | 0.08% | 0.00% | 0.08% | 175% |
| FSNJX | Fidelity Freedom® 2005 K | 0.42% | 0.20% | 0.22% | FFGFX | Fidelity Freedom® Index 2005 Instl Prem | 0.08% | 0.00% | 0.08% | 175% |
| FSNKX | Fidelity Freedom® 2010 K | 0.46% | 0.20% | 0.26% | FFWTX | Fidelity Freedom® Index 2010 Instl Prem | 0.08% | 0.00% | 0.08% | 225% |
| FSNLX | Fidelity Freedom® 2015 K | 0.49% | 0.20% | 0.29% | FIWFX | Fidelity Freedom® Index 2015 Instl Prem | 0.08% | 0.00% | 0.08% | 263% |
| FSNOX | Fidelity Freedom® 2020 K | 0.52% | 0.20% | 0.32% | FIWTX | Fidelity Freedom® Index 2020 Instl Prem | 0.08% | 0.00% | 0.08% | 300% |
| FSNPX | Fidelity Freedom® 2025 K | 0.56% | 0.20% | 0.36% | FFEDX | Fidelity Freedom® Index 2025 Instl Prem | 0.08% | 0.00% | 0.08% | 350% |
| FSNQX | Fidelity Freedom® 2030 K | 0.60% | 0.20% | 0.40% | FFEGX | Fidelity Freedom® Index 2030 Instl Prem | 0.08% | 0.00% | 0.08% | 400% |
| FSNUX | Fidelity Freedom® 2035 K | 0.63% | 0.20% | 0.43% | FFEZX | Fidelity Freedom® Index 2035 Instl Prem | 0.08% | 0.00% | 0.08% | 438% |
| FSNVX | Fidelity Freedom® 2040 K | 0.65% | 0.20% | 0.45% | FFIZX | Fidelity Freedom® Index 2040 Instl Prem | 0.08% | 0.00% | 0.08% | 463% |
| FSNZX | Fidelity Freedom® 2045 K | 0.65% | 0.20% | 0.45% | FFOLX | Fidelity Freedom® Index 2045 Instl Prem | 0.08% | 0.00% | 0.08% | 463% |
| FNSBX | Fidelity Freedom® 2050 K | 0.65% | 0.20% | 0.45% | FFOPX | Fidelity Freedom® Index 2050 Instl Prem | 0.08% | 0.00% | 0.08% | 463% |
| FNSDX | Fidelity Freedom® 2055 K | 0.65% | 0.20% | 0.45% | FFLDX | Fidelity Freedom® Index 2055 Instl Prem | 0.08% | 0.00% | 0.08% | 463% |
| FNSFX | Fidelity Freedom® 2060 K | 0.65% | 0.20% | 0.45% | FFLEX | Fidelity Freedom® Index 2060 Instl Prem | 0.08% | 0.00% | 0.08% | 463% |
| FFSDX | Fidelity Freedom® 2065 K | 0.65% | 0.20% | 0.45% | FFIKX | Fidelity Freedom® Index 2065 Instl Prm | 0.08% | 0.00% | 0.08% | 463% |

| Defendants' Investments *(continued)* | | | | | Prudent Alternative Investments *(continued)* | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Expense to Retirement Plans (%) | Defendants' Plan's Investment Excessive Fees (%) |
| AAGPX | American Beacon Large Capital Value | 0.96% | 0.40% | 0.56% | FLCOX | Fidelity® Large Cap Value Index Prm Inst | 0.04% | 0.00% | 0.04% | 1500% |
| NSVAX | Columbia Small Capital Value Fund II Z | 1.04% | 0.40% | 0.64% | FISVX | Fidelity® Small Cap Value Index | 0.05% | 0.00% | 0.05% | 1180% |
| FBCGX | Fidelity® Blue Chip Growth K6 | 0.45% | 0.00% | 0.45% | FSPGX | Fidelity® Large Cap Growth Idx Instl Prm | 0.04% | 0.00% | 0.04% | 1186% |
| FLCNX | Fidelity® Contrafund® K6 | 0.45% | 0.00% | 0.45% | FSPGX | Fidelity® Large Cap Growth Idx Instl Prm | 0.04% | 0.00% | 0.04% | 1186% |
| FKIDX | Fidelity® Diversified Intl K6 | 0.60% | 0.00% | 0.60% | FSGGX | Fidelity® Global ex US Index | 0.06% | 0.00% | 0.06% | 900% |
| FGOVX | Fidelity® Government Income | 0.45% | 0.10% | 0.35% | FUAMX | Fidelity® Interm Trs Bd Index | 0.03% | 0.00% | 0.03% | 1067% |
| SPAXX | Fidelity Government Money Market | 0.42% | 0.00% | 0.42% | VMRXX | Vanguard Prime Money Market Fund Admiral | 0.10% | 0.00% | 0.10% | 320% |
| FGIKX | Fidelity® Growth & Income K | 0.51% | 0.20% | 0.31% | FXAIX | Fidelity® 500 Index Institutional Prem | 0.02% | 0.00% | 0.02% | 1967% |
| FGCKX | Fidelity Growth Company K | 0.75% | 0.20% | 0.55% | FSPGX | Fidelity® Large Cap Growth Idx Instl Prm | 0.04% | 0.00% | 0.04% | 1471% |
| FLPKX | Fidelity® Low-Priced Stock K | 0.50% | 0.00% | 0.50% | FIMVX | Fidelity® Mid Cap Value Index | 0.05% | 0.00% | 0.05% | 900% |
| FPUKX | Fidelity® Puritan® K | 0.45% | 0.20% | 0.25% | VBAIX | Vanguard Balanced Index I | 0.06% | 0.00% | 0.06% | 317% |
| FRESX | Fidelity Real Estate Investments | 0.74% | 0.25% | 0.49% | FSRNX | Fidelity® Real Estate Index Instl | 0.07% | 0.00% | 0.07% | 600% |
| SPAXX | Fidelity Retirement Money | 0.42% | 0.00% | 0.42% | VMRXX | Vanguard Prime Money Market Fund Admiral | 0.10% | 0.00% | 0.10% | 320% |
| FSCRX | Fidelity Small Capital Discovery | 0.61% | 0.25% | 0.36% | FSSNX | Fidelity® Small Cap Index Instl Prem | 0.03% | 0.00% | 0.03% | 1340% |
| PTRAX | PIMCO Total Return Administrative Class | 0.96% | 0.25% | 0.71% | FXNAX | Fidelity® US Bond Index Instl Prem | 0.03% | 0.00% | 0.03% | 2740% |
| | Average | 0.60% | 0.17% | 0.42% | | Average | 0.06% | 0.00% | 0.06% | 761.82% |

151. During the Class Period and based on the charts above, the average Net Investment Expense to Retirement Plans of the investments selected and made available to Plan Participants by the Plan fiduciaries identified above was 0.42%, or 42 basis points.

152. During the Class Period and based on the charts above, the investment options selected by the Plan fiduciaries were 761.82% more expensive than prudent alternative and less expensive options covering the same asset category and same investment approach.

153.    The higher fee, charged by the 2040 through 2060 Active funds, represents an annual cost to investors that is over eight times higher than what shareholders of the corresponding Index fund pay. The impact of such high fees on participant balances is aggravated by the effects of compounding, to the significant detriment of Participants over time. This effect is illustrated by the below chart, published by the SEC, showing the 20-year impact on a balance of $100,000 by fees of 25 basis points (0.25%), 50 basis points (0.50%), and 100 basis points (1.00%).



154.    Higher fees significantly reduce retirement account balances over time. Considering just the gap in expense ratios from the Plan's investment in the Active suite to the Institutional Premium share class of the Index suite, in 2019 alone, the Plan could have saved approximately $1.46 million in costs. Fidelity is heavily incentivized to promote its own investment products, specifically those that charge the highest fees, to each plan for which it which is provides RPS, including the Plan.

**FIDELITY FREEDOM ACTIVE TARGET DATE SUITES' UNDERPERFORMACE**

155.    Additionally, in the period following the strategy overhaul in 2013 and 2014, the Active suite's higher levels of risk have failed to produce substantial outperformance when compared to the Index suite.

156.    Since the strategic changes took effect in 2014, the Index suite has outperformed the Active suite in four out of six calendar years. Broadening the view to historical measures that encompass a period closer to a full market cycle, the Active suite has substantially underperformed the Index suite on a trailing three- and five-year annualized basis:

| 3-Year Trailing Performance as of 5/31/20 | | | | |
|---|---|---|---|---|
| Freedom Suite | Return | Freedom Index Suite | Return | Difference |
| Income K | 4.03% | Income Inst Prem | 5.05% | -1.02% |
| 2005 K | 4.39% | 2005 Inst Prem | 5.44% | -1.05% |
| 2010 K | 4.66% | 2010 Inst Prem | 5.73% | -1.07% |
| 2015 K | 4.85% | 2015 Inst Prem | 6.01% | -1.16% |
| 2020 K | 4.95% | 2020 Inst Prem | 6.17% | -1.22% |
| 2025 K | 5.08% | 2025 Inst Prem | 6.32% | -1.24% |
| 2030 K | 5.38% | 2030 Inst Prem | 6.68% | -1.30% |
| 2035 K | 5.25% | 2035 Inst Prem | 6.63% | -1.38% |
| 2040 K | 5.00% | 2040 Inst Prem | 6.38% | -1.38% |
| 2045 K | 5.02% | 2045 Inst Prem | 6.38% | -1.36% |
| 2050 K | 4.96% | 2050 Inst Prem | 6.39% | -1.43% |
| 2055 K | 5.00% | 2055 Inst Prem | 6.39% | -1.39% |
| 2060 K | 4.99% | 2060 Inst Prem | 6.37% | -1.38% |

| 5-Year Trailing Performance as of 5/31/20 | | | | |
|---|---|---|---|---|
| Freedom Suite | Return | Freedom Index Suite | Return | Difference |
| Income K | 3.78% | Income Inst Prem | 4.06% | -0.28% |
| 2005 K | 4.21% | 2005 Inst Prem | 4.54% | -0.33% |
| 2010 K | 4.57% | 2010 Inst Prem | 4.92% | -0.35% |
| 2015 K | 4.87% | 2015 Inst Prem | 5.29% | -0.42% |
| 2020 K | 5.03% | 2020 Inst Prem | 5.51% | -0.48% |
| 2025 K | 5.17% | 2025 Inst Prem | 5.71% | -0.54% |
| 2030 K | 5.59% | 2030 Inst Prem | 6.20% | -0.61% |
| 2035 K | 5.68% | 2035 Inst Prem | 6.38% | -0.70% |
| 2040 K | 5.55% | 2040 Inst Prem | 6.25% | -0.70% |
| 2045 K | 5.55% | 2045 Inst Prem | 6.25% | -0.70% |
| 2050 K | 5.53% | 2050 Inst Prem | 6.25% | -0.72% |
| 2055 K | 5.53% | 2055 Inst Prem | 6.24% | -0.71% |
| 2060 K | 5.51% | 2060 Inst Prem | 6.23% | -0.72% |

157.    Based on the information available to and known by the Plan fiduciaries at the time of their decision-making, the selection and retention of the Fidelity Active Suite was imprudent considering the availability of, among many other options, the Fidelity Index Suite.  No prudent fiduciary could have objectively and reasonably concluded that the Active Suite was more likely to result in better outcomes for Plan participants than the Index Suite.

158.    Defendants breached their fiduciary duty to Plaintiffs and Plan Participants by choosing to select and retain the Active suite, thus causing Plan participants to miss out on greater investment returns for their retirement savings.

159.    During the Class Period and because Defendants failed to act in the best interests of the Plan's Participants by engaging in an objectively reasonable investigation process when selecting its investments, Plaintiffs and the Plan's Participants incurred unnecessary and substantial expenses and costs.

160.    During the Class Period and had Defendants acted in the best interests of the Plan's Participants by engaging in an objectively reasonable investigation process when selecting its investments, Defendants would have prudently chosen lower-cost investment alternatives.

161.    During the Class Period and because Defendants failed to act in the best interests of the Plan's Participants by engaging in an objectively reasonable investigation process when selecting its investments, Defendants caused objectively unreasonable and unnecessary losses to Plaintiffs and the Plan's Participants in the amount of approximately $10,483,398 through 2019 and as detailed in the following chart:

### Investment Fee Detail

| Actual Investment Lineup | | | | | |
|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 |
| Net Investment Expense to Retirement Plans | $1,487,478 | $1,706,849 | $2,215,868 | $2,133,453 | $2,761,566 |

| Prudent Alternative Investments | | | | | |
|---|---|---|---|---|---|
| Net Investment Expense to Retirement Plans | $350,129 | $416,887 | $515,788 | $448,849 | $554,215 |
| Est. Investment Damages | $1,137,350 | $1,289,962 | $1,700,081 | $1,684,604 | $2,207,351 |
| Compounding Percentage (VIIIX) | | 11.95% | 21.82% | -4.41% | 31.48% |
| Est. Cumulative Investment Damages | $1,137,350 | $2,563,225 | $4,822,601 | $6,294,529 | $10,483,398 |

### CLASS ACTION ALLEGATIONS

162.    29 U.S.C. §1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. §1109(a).

163.     In acting in this representative capacity, Plaintiffs seek to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiffs seek to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the Bronson Group Healthcare, Inc. 403(b) Tax Sheltered and Matching Plan (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning May 6, 2015 and running through the date of judgment.

164.     The Class includes over 11,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

165.     There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owes fiduciary duties to the Plan and took the actions and omissions alleged as to the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

- Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether Defendants breached their fiduciary duties to the Plan;

- What are the losses to the Plan resulting from each breach of fiduciary duty; and

- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

166.     Plaintiffs' claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiffs were Participants during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

167.     Plaintiffs will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because they were Participants in the Plan during the Class period, have no

interest that conflicts with the Class, are committed to the vigorous representation of the Class, and have engaged experienced and competent lawyers to represent the Class.

168.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

169.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

170.    Plaintiffs' attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

171.    The claims brought by the Plaintiffs arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts. The claims asserted on behalf of the Plans in this case fall outside the scope of any exhaustion language in the Plan. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a Plan for breaches of fiduciary duty.

172.    Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA Plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the Plan.

173.    Any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a Plan administrator's decision – does not exist here because courts will not defer to Plan administrator's legal analysis and interpretation.

**FIRST CLAIM FOR RELIEF**
**Breaches of Duties of Loyalty and Prudence of ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class, Against All Defendants – RPS Fees)**

174.    Plaintiffs restate the above allegations as if fully set forth herein.

175.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§1002(21) and/or 1102(a)(1).

176.    29 U.S.C. §1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan.

177.    Defendants, as fiduciaries of the Plan, are responsible for selecting a RPSP that charges reasonable RPS fees.

178.    During the Class Period, Defendants had fiduciary duties to do all of the following: ensure that the Plan's RPS fees were reasonable; manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

179.    During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiffs, by failing to: ensure that the Plan's RPS fees were reasonable, manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

180.    During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's RPSP to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding RPS and the significant bargaining power the Plan had to negotiate the best fees.

181.    During the Class Period, Defendants breached their duty to Plan Participants, including Plaintiffs, by failing to employ a prudent and loyal process and by failing to evaluate the cost and performance of the Plan's RPSP critically or objectively in comparison to other RPSP options.

182.    Through these actions and omissions, Defendants breached their fiduciary duties of prudence and loyalty with respect to the Plan in violation 29 U.S.C. §1104(a)(1)(A), (B).

183.    Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breached its duties under 29 U.S.C. §1104(a)(1)(B).

184.    As a result of Defendants' breach of fiduciary duty of prudence and loyalty with respect to the Plan, the Plaintiffs and Plan Participants suffered objectively unreasonable and unnecessary monetary losses.

185.    Defendants are liable under 29 U.S.C. §§1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made using Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2).

**SECOND CLAIM FOR RELIEF**
**Breaches of Duties of Loyalty and Prudence of ERISA, as Amended**
**(Plaintiffs, on behalf of themselves and Class, Against All Defendants –**
**Investment Management Fees)**

186.    Plaintiffs restate the above allegations as if fully set forth herein.

187.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

188.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in managing the investments of the Plan.

189.    Defendants, as fiduciaries of the Plan, are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently.

190.    During the Class Period, Defendants had a fiduciary duty to do all the following: manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

191.    During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiffs, by failing to manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries, defray reasonable expenses of administering the Plan, act with the care, skill, diligence, and prudence required by ERISA.

192.    Defendants, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess whether the Plan's investments were prudent choices for the Plan and to remove imprudent investment options regardless of how long said investments had been in the Plan.

193.    During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiffs, by failing to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period.

194.    Defendants were directly responsible for ensuring that the Plan's investment management fees were reasonable, selecting investment options in a prudent fashion in the best interest of Plan Participants, prudently evaluating and monitoring the Plan's investments on an ongoing basis and eliminating funds that did not serve the best interest of Plan Participants, and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

195.    Defendants failed to employ a prudent and loyal process by failing to evaluate the cost and performance of the Plan's investments and fees critically or objectively in comparison to other investment options. Defendants selected and retained for years as Plan investment options mutual funds with high expenses relative to other investment options that were readily available to the Plan at all relevant times.

196.    Through these actions and omissions, Defendants breached their fiduciary duties of prudence and loyalty with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(A), (B).

197.    Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting

in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breached its duties under 29 U.S.C. § 1104(a)(1)(B).

198.     As a result of Defendants' breach of their fiduciary duties of prudence and loyalty with respect to the Plan, as aforesaid, the Plaintiffs and Plan Participants suffered unreasonable and unnecessary monetary losses.

199.     Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made using Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

### THIRD CLAIM FOR RELIEF
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
<u>**(Plaintiffs, on behalf of themselves and Class, Against All Defendants–**
**RPS Fees)**</u>

200.     Plaintiffs restate the above allegations as if fully set forth herein.

201.     Defendants had the authority to appoint and remove members or individuals responsible for Plan RPS fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

202.     Considering this authority, Defendants had a duty to monitor those individuals responsible for Plan RPS fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan if these individuals were not fulfilling those duties.

203.     Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources

and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

204.   The excessive RPS fees paid by the Plan inferentially suggest that Bronson and the Board breached their duty to monitor by, among other things:

a.   Failing to monitor and evaluate the performance of individuals responsible for Plan RPS fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high RPS expenses;

b.   Failing to monitor the process by which the Plan's RPSP were evaluated and failing to investigate the availability of lower-cost RPSP; and

c.   Failing to remove individuals responsible for Plan RPS fees whose performance was inadequate in that these individuals continued to pay the same RPS costs even though benchmarking and using other similar comparators would have showed that maintaining Fidelity as the RPSP, at the contracted price was imprudent, excessively costly, all to the detriment of the Plan and Plan Participants' retirement savings.

205.   As the consequences of the foregoing breaches of the duty to monitor for RPS fees the Plaintiffs and Plan Participants suffered unreasonable and unnecessary monetary losses.

206.   Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan RPS fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**FOURTH CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**<u>(Plaintiffs, on behalf of themselves and Class, Against All Defendants –</u>**
**<u>Investment Management Fees)</u>**

207.   Plaintiffs restate the above allegations as if fully set forth herein.

208.   Bronson, through its Board, had the authority to appoint and remove members or individuals responsible for Plan investment management and were aware that these fiduciaries had critical responsibilities for the Plan.

209.   In light of this authority, Bronson, through its Board, had a duty to monitor those individuals responsible for Plan investment management to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

210.   Bronson, through its Board, had a duty to ensure that the individuals responsible for Plan investment management possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Bronson.

211.   The excessive investment management fees paid by the Plan, in the form of the Fidelity Freedom Active Target Date suite and other high-cost investments, inferentially suggest that Bronson and the Board breach their duty to monitor the individuals they appointed by, among other things:

a.   Failing to monitor and evaluate the performance of individuals responsible for Plan investment management or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high expenses with regard to the Target Date suite, and inefficient fund management styles that adversely affected the investment performance of the funds' and their Participants' assets as a result of these individuals responsible for Plan imprudent actions and omissions;

b.      Failing to monitor the process by which Plan investments were evaluated, failing to investigate the availability of lower-cost Target Date suites, and failing to investigate the availability of lower-cost investments, including collective trust vehicles; and

c.      Failing to remove individuals responsible for Plan administration whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan Participants' retirement savings.

212.    As a result of Defendants' foregoing breaches of the duty to monitor, the Plaintiffs and Plan Participants suffered unreasonable and unnecessary monetary losses.

213.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan administration. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.      A determination that this action may proceed as a class action under Rule  23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.      Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.      A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.      An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligation;

E.      An Order requiring Defendant Bronson to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. §1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Bronson as necessary to effectuate relief, and to prevent Bronson' unjust enrichment;

F.      An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.      Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan Fiduciaries deemed to have breached their fiduciary duties;

H.      An award of pre-judgment interest;

I.      An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.      Such other and further relief as the Court deems equitable and just.

        Dated this 6th day of May, 2021


                                        s/ Troy W. Haney
                                        Troy W. Haney
                                        HANEY LAW FIRM, P.C.
                                        330 E. Fulton
                                        Grand Rapids, MI 49503
                                        Telephone: (616) 235-2300
                                        Fax: (616) 459-0137
                                        E-Mail: thaney@troyhaneylaw.com

                                        James A. Walcheske, State Bar No. 1065635
                                        Scott S. Luzi, State Bar No. 1067405
                                        Paul M. Secunda, State Bar No. 1074127
                                        WALCHESKE & LUZI, LLC
                                        235 N. Executive Dr., Suite 240
                                        Brookfield, Wisconsin 53005
                                        Telephone: (262) 780-1953
                                        Fax: (262) 565-6469
                                        E-Mail: jwalcheske@walcheskeluzi.com
                                        E-Mail: sluzi@walcheskeluzi.com
                                        E-Mail: psecunda@walcheskeluzi.com

                                        Attorneys for Plaintiffs